Filed 3/4/13  P. v. DeLeon CA2/3
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B226617 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA062172) |
| v. | |
| MICHAEL DeLEON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, John David Lord, Judge.  Affirmed.

Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Chung L. Mar and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

Michael DeLeon appeals from the judgment entered following his convictions by jury on count 1 – second degree murder (Pen. Code, § 187[1]) with findings a principal personally and intentionally used a firearm, discharged a firearm, and discharged a firearm causing great bodily injury or death (former § 12022.53, subds. (b)-(d) & (e)(1)), and on count 2 – discharge of a firearm with gross negligence (§ 246.3, subd. (a)) with findings appellant committed the above offenses for the benefit of a criminal street gang (former § 186.22, subd. (b)).  The court sentenced appellant to prison for 40 years to life. We affirm the judgment.

### FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established in June 2007, Jovani Leiva knew appellant, Jesse Silva, and Marco Flores.[2]  The monikers of the last three were Dreamer, Cholo (which means gangster), and Diablo, respectively.  Leiva had met the three at Branford Park.  According to Leiva, appellant was from the Pacoima Trece gang, Silva was from the Pacoima gang, and Flores was from the Orcas gang.

On the evening of June 15, 2007, David Delgado was at a party at 12462 Osborne in Los Angeles County.  After midnight, Delgado and Albert Molina (the decedent) were inside the gate of the property and conducting patdown weapons searches of persons entering.

Leiva drove a car containing appellant, Silva, Flores, and a person named Lalo from Branford Park to a location near the party.  Leiva parked and the group walked to the house.  Leiva saw a black firearm in Flores's waistband.  The group approached the gate.

---

[1]     Unless otherwise indicated, subsequent statutory references are to the Penal Code.

[2]     Codefendants appellant and Silva were jointly charged but separately tried.  Silva is not a party to this appeal.

According to Leiva, as Leiva walked towards the gate, he knew Flores had a gun, but Leiva did not say anything to Flores or to anyone else in the group. Leiva testified, "Who is going to tell these guys? You couldn't tell them nothing."

Appellant and Silva were searched. The persons conducting the search discovered the gun. Silva threw a punch at one of them and the gate was closed. Flores gave the gun to appellant and appellant shot it two to five times in the air. Leiva testified that, before any shots were fired, he heard "their gangs" being "yelled out." Appellant and Silva yelled Pacoima, and Flores yelled Orcas.

After appellant shot in the air, Silva obtained the gun and fired three or five shots into the crowd. During the shooting, someone was yelling Pacoima. Leiva was trying to convince people at the gate to let his group inside when he heard the shots in the air, looked back, and saw appellant handing the gun to Silva. After the shooting and as Leiva was running to his car, someone was yelling Pacoima. Leiva let the group enter his car because they had a gun and he could not stop them. Leiva testified the group was saying "get away." He also testified Flores took bullets from the gun and "they were throwing it [*sic*] out the window." Leiva initially made false statements to police because he was afraid.

According to Delgado, Delgado told members of the group at the gate to submit to a search. Delgado believed the group consisted of about four persons. A person, later identified as Silva, had one hand inside his waistband while his other hand held a beer bottle. Delgado testified someone in the group entered through the gate, and someone indicated "we're just going to come in. Nobody is going to search us." Delgado insisted on searching them.

At least two men in the group screamed profanities, yelled gang-related statements like "Fuck Vineland" and "Vegetables," and indicated they were looking for Vineland gang members. The word "vegetables" was a derogatory reference to the "Vineland Boyz" gang (Vineland). The males who were yelling stepped back, and one of Delgado's friends closed the gate.

3

Silva threw the bottle at Delgado and his companions, and the bottle broke on the gate. Someone in appellant's group tried to open the gate, but Delgado's group stopped them. Silva drew a gun and fired it once or twice in the air. Silva pointed the gun in the direction of the crowd and shot towards the crowd. Silva then moved the gun towards Delgado's group. Delgado grabbed Molina and moved, then Delgado heard a shot. Molina stepped back, held his chest, and said he could not breathe. Molina was mortally wounded. At the time of the shooting neither Delgado nor Molina had a gun. Appellant's group fled.

Los Angeles Police Detective Jose Martinez testified he had seen appellant prior to trial. A photograph shown to Martinez at trial depicted appellant's hair as short as Martinez had seen it in the past. Appellant's hair in the past appeared different than his hair at trial. Other photographs depicted tattoos on appellant's left hand and the letter P on appellant's left foot or left shin.

On June 9, 2008, Martinez, in the presence of appellant's mother, interviewed appellant at the police station about the above shootings. Martinez told appellant that Silva had said appellant did the shooting. Appellant told Martinez that Silva was out of control.

Appellant also told Martinez the following. Appellant did not shoot anyone. Appellant and his companions were walking to a party, a girl started repeatedly screaming Vineland, "[a]nd then start shooting." (*Sic*.) Appellant's companions were Silva, Flores, and someone else. Leiva was driving, and appellant thought Flores threw shells out the window. The gun was a chrome revolver with a black handle.

Appellant later told Martinez the following. Appellant shot the gun twice in the air that night because he saw many people coming towards him. Appellant told Martinez, "And then he was like, 'Give it to me.' " That person then shot for no reason. Appellant also said "they were coming at us" and that this occurred after appellant had fired shots. The approaching people were throwing beer bottles, and two of them closed the gate. Appellant later left with others.

4

Still later, appellant told Martinez the following. Appellant and his companions took a gun "just because" and because there were "three different hoods" going to the party. Treces and Orcas did not get along with Vineland. Flores had the gun when the group was "rolling up" on the party. An intoxicated girl was saying Vineland, so appellant and those with him started saying "fuck" "[v]egetables." Appellant obtained the gun when his group was near the gate. Persons at the gate were trying to conduct a search. Appellant had the gun "right here," moved back, "then that's when they tried to rush me." Appellant "pulled it out and shot two." Appellant's group was about to leave, then Silva "just gets it and started letting loose."

Appellant also told Martinez a person grabbed appellant and said the person was going to search appellant. Appellant backed off and hit the person. The person appellant hit went back, a group of persons went inside, the gate was closed, then another person started throwing bottles. Appellant was later told the person who had been shot had died.

Martinez asked appellant if he shouted Paca Treces, Paca, or Pacoima, and appellant replied, "I just said Pacoima." Martinez indicated one person shouted Orcas, and Martinez asked what Silva was shouting. Appellant replied, "Cayugas." Martinez asked appellant if appellant said Pacoima before or after the shooting. Appellant replied, "We said it before and after." Martinez asked why, and appellant replied he did not know. Martinez asked if it was done to scare people, and appellant replied, "I guess. We were just – it was in the moment, you know, screaming the hood out loud." Appellant told Martinez that appellant was 17 years old.

Los Angeles Police Officer Michael Yoro testified appellant, in the courtroom, had a full head of hair and was wearing glasses, but Yoro denied appellant always had had a full head of hair and always had worn glasses. During Yoro's previous contacts with appellant, appellant always had a shaved head or closely cut hair.

Yoro, a gang expert, testified concerning the Pacoima Treces (PT) gang. The Pacoima Cayuga Street Locos (PCSL) gang and the "Orkas" gang were allies of, and derived from, PT. Vineland was a rival gang of PT. The address of 12462 Osborne was

5

in an area occupied by members of, inter alia, PT. PT members congregated in Branford Park. Appellant and Flores were PT members.[3] Silva was a PCSL member who perceived Vineland as his enemy.

The prosecutor posed without objection a hypothetical question which was based on facts corresponding to evidence of the events leading to and including the above shootings, and the prosecutor asked whether the "shooting was for the benefit of or in the association with or at the direction of a criminal street gang, [PT]." In response, Yoro opined the shooting in the air, as well as the shooting and killing of the decedent, were gang-related and "done in benefit and in association of the [PT] gang."

Yoro testified "the fact that these individuals arrived at the party and refused to be searched shows that they will not be disrespected and, how dare you come to our neighborhood and either charge us or search us. You will allow us entry. That's their mentality." Yoro also testified "these gang members" communicated verbally by claiming their gang territory by yelling Pacoima, and communicated nonverbally by firing shots into the air and later towards the crowd, resulting in the death of a person conducting a search. Yoro testified this "[s]hows that they will not be disrespected and you will recognize and fear our gang." Appellant presented no defense evidence.

## ISSUES

Appellant claims (1) his statement to Martinez was inadmissible under *Miranda*,[4] (2) the trial court erroneously permitted the prosecutor to pose leading questions to Leiva, (3) the prosecutor committed misconduct during jury argument, (4) Yoro's expert testimony was elicited through the prosecutor's impermissible hypothetical questions, (5) cumulative prejudicial error occurred, and (6) appellant's sentence constituted cruel and unusual punishment.

---

[3] Yoro testified it had been said Flores was a member of Orkas, a gang closely associated with PT.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

## DISCUSSION

1. *No Miranda Error Occurred.*

    a. *Pertinent Facts.*

During pretrial proceedings, appellant moved to exclude his statement to Martinez on the ground he obtained it in violation of *Miranda*. At the hearing on the motion, appellant indicated he was disputing whether he was in custody for purposes of *Miranda*. Martinez later testified at the hearing as follows. On June 9, 2008, Martinez was investigating a case involving appellant, Silva, and Flores. Prior to June 9, 2008, Martinez had spoken to Silva and had read a report prepared by a detective who had spoken to Flores.

On the morning of June 9, 2008, Martinez served a search warrant at appellant's home. Appellant was not present but his mother was. Martinez told appellant's mother that Martinez was investigating appellant in relation to a murder. Martinez told appellant's mother that Martinez had an arrest warrant for appellant. The warrant was not for the 2008 murder of Johnny Lopez.[5]

Later on June 9, 2008, appellant's mother brought appellant to the Foothill station. Nonetheless, Martinez would have let appellant walk out if appellant had chosen to do so. At the time, appellant was a suspect in the Molina murder. Martinez was not at the station when appellant arrived. Martinez was called, and he returned to the station to interview appellant.

During cross-examination, Martinez testified as follows. Once Martinez arrived at the station, if appellant had walked out, Martinez would have let appellant leave, even though Martinez had the arrest warrant. At the time, Martinez was not going to take appellant into custody for either murder. During cross-examination, appellant's counsel indicated he was asking Martinez about whether Martinez was going to take appellant into custody for the Molina murder, and Martinez replied, "At that point, no." When

---

[5] Respondent concedes Martinez obtained the arrest warrant "for appellant's arrest with respect to the Molina murder," and so informed appellant's mother.

7

appellant and his mother came to the station to talk to Martinez, Martinez told appellant that appellant was free to go. Martinez testified, "Actually, I told them that [appellant] could go at any time prior to any conversation and he could leave any time."

Prior to the interview, Martinez told appellant that appellant was not under arrest and appellant could go whenever he wanted to go. After Martinez said this to appellant, Martinez began questioning appellant about the Molina and Lopez murders. Appellant was not in handcuffs when Martinez began interviewing him. The interview occurred in an interview room. Appellant's mother was present but no officer other than Martinez was present. Martinez recorded the conversation from its inception.

The interview of appellant and his mother lasted about 110 minutes. Martinez denied that during the first approximate 30 minutes of the interview, appellant implicated himself in the 2007 Molina incident by "admit[ing] to being there." Probably the majority of the first 30 minutes consisted of Martinez "interviewing [appellant's] mother and us discussing" the Lopez murder. About 55 minutes into the interview, Martinez began discussing with appellant that appellant was present during the Molina incident. Appellant was never charged with the Lopez murder and the portion of Martinez's conversation with appellant about that murder was investigatory. During the interview, appellant gave Martinez a statement that implicated appellant in the Molina murder. Martinez did not advise appellant of his *Miranda* rights prior to, or during, the interview.

Based on appellant's statement implicating him in the Molina murder, Martinez decided to take appellant into custody. At the end of the interview, Martinez told appellant that appellant was going to be arrested for firing a gun. Martinez also testified he told this to appellant, "I would say 7/8's in the complete interview." After the interview concluded, Martinez took appellant into custody in his mother's presence. Another officer read to appellant his *Miranda* rights at that time. Appellant's mother left after the interview. No one testified at the hearing as to appellant's age.

During argument on the motion, appellant urged as follows. Based on Martinez's conversations with the codefendants, his obtaining of a search warrant for appellant's

home, and Martinez's obtaining of an arrest warrant for appellant, appellant was a suspect at least in the Molina murder case and was going to be arrested. Appellant's mother brought appellant into the station and, although "that was voluntarily," appellant should have been advised of his *Miranda* rights at that time. As to the Lopez murder, appellant conceded Martinez might have been merely conducting an investigation.

The trial court stated, "State of the law after *Berkemer*[6] . . . would be that it would require more than what was within the police officer's mind." The court denied appellant's motion to exclude his statement.

b. *Analysis.*

Appellant claims his statement to Martinez was inadmissible under *Miranda*. We disagree. The issue is whether any interrogation of appellant was custodial. Whether a person is in custody is an objective test; the pertinent inquiries are whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest and whether a reasonable person in the defendant's position would have felt free to end the questioning and leave. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) We "[d]isregard[] the *uncommunicated* subjective impressions of police regarding the defendant's custodial status as irrelevant." (*People v. Stansbury* (1995) 9 Cal.4th 824, 830 (*Stansbury*), italics added.)

In the present case, there was substantial evidence as follows. Appellant was not formally arrested until after the interview concluded. Although Martinez had an arrest warrant for appellant, no evidence was presented at the hearing that this fact or the fact appellant was a suspect was ever communicated to appellant. Appellant conceded below his mother brought him to the station voluntarily, and there was no evidence he came other than voluntarily. When appellant and his mother arrived, Martinez told appellant and his mother that appellant could go at any time prior to any conversation, and that he could leave at any time.

---

**6** The trial court was presumably referring to *Berkemer v. McCarty* (1984) 468 U.S. 420, 439-440 [82 L.Ed.2d 317] (*Berkemer*).)

9

Prior to the interview, Martinez told appellant that appellant was not under arrest. Although Martinez interviewed appellant for almost two hours at the station, appellant's mother was present and the only officer present was Martinez. Appellant was not handcuffed when the interview began, no evidence was presented at the hearing that any restrictions were placed on his movement during the interview, and no evidence was presented Martinez was aggressive, confrontational, or accusatory, or that Martinez pressured appellant. Apparently, Martinez and appellant's mother conversed during the first approximate 15 minutes of the interview; appellant's involvement in that portion of the interview was not clear. Appellant did not dispute below Martinez's conversation with appellant about the Lopez murder was investigatory.

We conclude there was substantial evidence supporting the trial court's implied finding no custodial interrogation occurred. When appellant made his statement to Martinez, appellant was not in custody for purposes of *Miranda*. (Cf. *People v. Whitson* (1998) 17 Cal.4th 229, 248; *Stansbury, supra,* 9 Cal.4th at p. 830; *People v. Clair* (1992) 2 Cal.4th 629, 679; *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404; *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 63-66; *People v. Lopez* (1985) 163 Cal.App.3d 602, 608; *United States v. Hinojosa* (6th Cir. 2010) 606 F.3d 875, 883-884; *United States v. Reynolds* (6th Cir.1985) 762 F.2d 489, 491-494.) Nor does the record of the hearing demonstrate Martinez attempted to circumvent *Miranda*.

*J. D. B. v. North Carolina* (2011) 564 U.S. ___ [180 L.Ed.2d 310] (*J. D. B.*), cited by appellant and involving police questioning of a 13-year-old (*id.* at p. ___ [180 L.Ed.2d at p. 319]), does not compel a contrary conclusion. *J. D. B.* "addressed custody determinations for purposes of requiring *Miranda* warnings. In that case, the high court held a child suspect's age, when known to the interrogating officer or objectively apparent to a reasonable officer, is relevant to the determination whether, considering all the objective circumstances of an interrogation, a reasonable person in the suspect's position would understand his freedom to terminate police questioning and leave." (*People v. Nelson* (2012) 53 Cal.4th 367, 383, fn.7.) *J. D. B.* reversed a state supreme

court decision which (1) concluded the minor was not in custody for purposes of *Miranda* but (2) expressly declined to extend the test for custody to include consideration of the age of an individual subjected to police questioning. (*J. D. B.,* at pp. ___ [180 L.Ed.2d at pp. 320-321, 329].)

Unlike the case in *J. D. B*., no court involved in the present case has expressly declined to extend the *Miranda* custody test to include consideration of appellant's age. Moreover, no testimony or substantial evidence was presented at the hearing in the present case that appellant was a juvenile, that, if appellant was a juvenile, Martinez knew it, or that appellant's age as a juvenile was objectively apparent to Martinez.

2. *The Trial Court Did Not Erroneously Permit Leading Questions by the Prosecutor.*

Appellant claims the trial court erroneously permitted the prosecutor during her redirect examination of Leiva to ask two leading questions eliciting Leiva's testimony that he saw appellant extend his hand to give the gun to Silva. Appellant argues the testimony was crucial to the People's effort to prove he aided and abetted murder, or assault with a deadly weapon. The two questions are italicized below and, for the reasons discussed below, we reject the claim.

a. *Pertinent Facts.*

Leiva testified during cross-examination to the effect that when he was trying to enter the gate, he heard shots in the air, looked back, and saw appellant "handing the gun to [Silva]." Leiva also testified, "I don't know if [Silva] grabbed it or it was a [handoff]." Leiva further testified he was "not sure if it was [a handoff] or grabbed it." (*Sic*.)

During redirect examination, the following occurred: "Q. And when you say you don't know whether [Silva] grabbed the gun or whether there was a [handoff], did you actually see [appellant] hand the gun? [¶] A. Yes. [¶] . . . [¶] A. Then he shot towards -- [¶] Q. Then [Silva] took it? [¶] A. Yeah. [¶] Q. . . . *But you actually saw [appellant] extend his hands*? [¶] A. Yeah. [¶] [Appellant's Counsel:] Objection, leading the witness. [¶] The Court: Overruled. [¶] Q. (By [The Prosecutor:]) *And when I say extend his hand, I mean extend his hand with a gun to [Silva]?* [¶] A. To

11

[Silva]. [¶] [Appellant's Counsel:] Again, your Honor, objection, leading. [¶] The Court: Overruled." During recross-examination, Leiva testified that appellant gave the gun to Silva, *and* that Silva grabbed it.

b. *Analysis.*

Evidence Code section 764 states, "A 'leading question' is a question that suggests to the witness the answer that the examining party desires." Evidence Code section 767, subdivision (a)(1), states, "(a) *Except under special circumstances where the interests of justice otherwise require*: [¶] (1) A leading question may not be asked of a witness on direct or redirect examination." (Italics added.) Trial courts have broad discretion to decide when such special circumstances are present. (*People v. Williams* (1997) 16 Cal.4th 635, 672 (*Williams*).) For example, "A leading question is permissible on direct examination when it serves 'to stimulate or revive [the witness's] recollection.' " (*Id.* at p. 672.)

Prior to the two challenged questions, portions of Leiva's cross-examination testimony could be understood to indicate Leiva saw appellant in the process of handing the gun to Silva prior to the point of transfer of the gun from appellant to Silva, but Leiva "[did not] know" and "was not sure" whether, at the point of transfer, appellant handed the gun to Silva or Silva merely grabbed it. Assuming appellant posed timely objections to the challenged questions and they were leading, they were permissible to serve to stimulate or revive Leiva's recollection about what happened at the point of transfer. The court did not abuse its discretion in permitting the challenged questions. (Cf. *People v. Collins* (2010) 49 Cal.4th 175, 215; *Williams, supra*, 16 Cal.4th at p. 672-673.)

Moreover, even if the trial court erred, it does not follow we must reverse the judgment. During appellant's cross-examination of Leiva, Leiva testified he saw appellant "handing the gun to [Silva]." Leiva's redirect examination testimony prior to the challenged questions reasonably may be understood to indicate Leiva actually saw appellant hand the gun to Silva and Silva take it. Leiva's testimony during recross-examination indicated, inter alia, appellant gave the gun to Silva.

12

As our Factual Summary reveals, there was ample other evidence appellant was an aider and abettor to Silva's murder of Molina, including gang evidence providing a motive for appellant to aid and abet Molina's murder, and statements appellant made to Martinez which reasonably may be construed as admissions appellant gave the gun to Silva. Any trial court error in permitting the two challenged questions was not prejudicial. (Cf. *Williams, supra*, 16 Cal.4th at p. 673; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

3. *No Prejudicial Prosecutorial Misconduct Occurred.*

    a. *Pertinent Facts.*

During opening argument, the prosecutor argued that under aiding and abetting law, what appellant did was, in many ways, worse than what Silva did because appellant handed Silva, appellant's "homie," a loaded gun when they were confronting rivals.

The prosecutor then commented without objection, *"And although [appellant] sits here looking like he's going to -- a nice school boy with a full head of hair and his nice studious glasses,* that's not the Michael DeLeon at the party that killed Albert Molina. He didn't have the full head of hair. He didn't have the glasses. But he did have a loaded gun. This isn't *the sweet, innocent kid that he portrays himself to be right here in this courtroom. I guess we're all on our best behaviors in the courtroom, especially when we're the ones on trial.* He isn't innocent. He is a full-fledged member, a documented member, of the Paca Trece gang. *He is a hood rat who walked around with his other hood rats using guns and killing people just because they thought they were dissed*, just because they thought they didn't like the people at the party." (Italics added.)

At the end of the prosecutor's closing argument, the prosecutor commented without objection, "*We're not hearing about this 16-year-old getting a respectable job. We're not hearing about this 16-year-old going to school and going to college. We're not hearing about this 16-year-old doing anything like that*. This 16-year-old is a killer and a gang member and that's all he is. I ask you for a verdict of guilty. Thank you." (Italics added.)

13

b. *Analysis.*

Appellant claims the prosecutor committed misconduct during jury argument. We address appellant's arguments the prosecutor (1) commented upon appellant's demeanor in the courtroom, (2) invoked racial and class stereotypes, and (3) commented upon appellant's failure to present character evidence.

At the outset, we conclude appellant waived all issues of prosecutorial misconduct by appellant's failure to object to the challenged comments on the ground of prosecutorial misconduct and by his failure to request a jury admonition with respect to said comments, which would have cured any harm. (Cf. *People v. Gionis* (1995) 9 Cal.4th 1196, 1215; *People v. Sandoval* (1992) 4 Cal.4th 155, 185.)

Even if the issues were not waived, appellant's claim lacks merit for the reasons discussed below. Prosecutorial argument may be vigorous as long as it amounts to fair comment on the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) The testimony of Martinez and Yoro provided evidence appellant's hair had been shorter prior to trial than appellant's hair was at trial and, although appellant was wearing glasses at trial, he had not always done so prior to trial. The first two previously italicized comments of the prosecutor were fair comment on the *evidence*. We reject appellant's vague claim the prosecutor improperly commented upon appellant's courtroom demeanor.

Moreover, the first two previously italicized comments reasonably could be construed as arguments the jury should disregard appellant's courtroom demeanor in favor of considering the evidence, in which case no misconduct occurred. (Cf. *People v. Yeoman* (2003) 31 Cal.4th 93, 148-149 (*Yeoman*); *People v. Boyette* (2002) 29 Cal.4th 381, 434.)

As to the prosecutor's use of the term "hood rat," appellant, citing an Internet dictionary, asserts the term is derogatory and invokes racial and class-based stereotypes. According to appellant, the dictionary he cites gives two meanings for the term (1) a young promiscuous woman from an impoverished urban area, and (2) " 'someone who hangs around the [black] neighborhood.' " (Bracketed word in the original.)

14

The term "hood rat" does not expressly refer to race or class. However, we assume without deciding the jury understood the term to refer to the alleged second meaning from the Internet dictionary. While we do not condone the use of opprobrious terms during jury argument, the prosecutor's brief references to the term during closing argument (which was otherwise free of prejudicial prosecutorial language) cannot reasonably be considered prejudicial prosecutorial misconduct in light of the ample evidence of appellant's guilt. (Cf. *Yeoman, supra,* 31 Cal.4th at p. 149.)

Our conclusion is reinforced by the facts the court, using CALCRIM No. 200, instructed the jury not to let bias, including bias based on race or socioeconomic status, influence their decision; that same instruction told the jury to decide this case based only on the evidence; and the court, using CALCRIM No. 222, instructed that nothing attorneys said was evidence. To the extent appellant relies on the mere reference to "hood," we note appellant told Martinez that appellant and his companions took a gun "just because" and because there were "three different hoods" going to the party.

We reach the same conclusion, as to the prosecutor's comments pertaining to a respectable job and college. Finally, to the extent appellant claims he received ineffective assistance of counsel by reason of his trial counsel's failure to object to the challenged argument, our analysis compels the conclusion no such ineffective assistance occurred.

4. *Yoro's Gang Expert Testimony Was Admissible.*

Appellant claims Yoro's gang expert testimony was elicited through the prosecutor's impermissible hypothetical questions, in response to which, according to appellant, Yoro presented expert opinion testimony on whether the offenses appellant committed were gang-related and done for the benefit of, and in association with, PT. Appellant argues that, as a result, his conviction on count 1, and the true findings as to the former section 186.22, subdivision (b) enhancement allegations, must be reversed.[7]

---

[7] Appellant acknowledges that, at the time he filed his opening brief, a related issue of whether a trial court erred by permitting certain hypothetical questions to a prosecution

15

Appellant failed to object below to Yoro's expert testimony which appellant now challenges; therefore, appellant waived the issues. (Evid. Code, § 353, subd. (a)). Even if the issues were not waived, they lack merit. In *Vang, supra,* 52 Cal.4th 1038, a gang expert, in response to hypothetical questions posed by a prosecutor, testified an assault would benefit a named gang and was committed in association with the gang and at the direction of the gang's members. The expert also testified the attack was gang-motivated. *Vang* concluded the prosecutor's hypothetical questions, although based on evidence-specific assumptions, were properly based on evidence at trial and the expert's opinion testimony in response was admissible and not rendered inadmissible by the fact, if true, the testimony pertained to an ultimate issue(s) to be decided by the trier of fact. (*Id*. at pp. 1042-1049.)

In the present case, the prosecutor essentially posed a hypothetical question which asked Yoro, an expert, to assume various facts based on the evidence. The prosecutor's question was proper and, in response, Yoro properly gave his expert opinion testimony. (Cf. *Vang, supra*, 52 Cal.4th at pp. 1042-1049.) To the extent appellant claims he received ineffective assistance of counsel by reason of his trial counsel's failure to object to Yoro's expert testimony, our analysis compels the conclusion no such ineffective assistance occurred. We also reject appellant's claim cumulative prejudicial error occurred.

5. *Appellant's Sentence on Count 1 Does Not Violate the Eighth Amendment*.

Appellant claims as to count 1 the Eighth Amendment categorically bars a sentence of 40 years to life for a homicide committed by a juvenile who did not kill or intend to kill and bars a mandatory sentence of 40 years to life for a homicide committed

---

expert witness was pending before our Supreme Court in *People v. Vang* (2010) 185 Cal.App.4th 309, review granted September 15, 2010 (S184212). In his reply brief, he acknowledges our Supreme Court's decision in *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), and claims "for purposes of further review in federal court" the prosecutor's hypothetical and Yoro's answer violated appellant's Fifth, Sixth, and Fourteenth Amendment rights.

16

by a juvenile.[8]  He also claims his sentence violates the Eighth Amendment based on the circumstances in his case.

a. *Pertinent Facts.*

As to count 1, the trial court instructed the jury on, inter alia, express and implied malice, first degree willful, deliberate, and premeditated murder, and a section 190.2, subdivision (a)(22) special circumstance applicable if appellant committed first degree murder, intentionally killing the victim while appellant was an active participant in a criminal street gang.  The court also instructed the jury as follows.  A person could be criminally liable as a perpetrator or as an aider and abettor.  An aider and abettor knew the perpetrator's unlawful purpose and "specifically intend[ed] to, and [did] in fact" aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime. Appellant was liable for murder as an aider and abettor if he aided and abetted the intended crime of murder or the intended crime of assault with a firearm, a natural and probable consequence of which was murder.

During jury argument, the prosecutor defined aiding and abetting consistent with the court's instruction and argued appellant aided and abetted Silva's commission of first degree willful, deliberate, and premeditated murder because, before Silva committed that crime, appellant gave the gun to Silva, knew of Silva's unlawful purpose to kill, and intended to facilitate the commission of the offense.

The prosecutor also argued appellant aided and abetted second degree implied malice murder because appellant gave the gun to Silva and knew of Silva's unlawful purpose to commit assault with a firearm (i.e., knew of Silva's unlawful purpose to commit an intentional act the natural and probable consequences of which would endanger life).  Discussing this implied malice theory, the prosecutor commented appellant gave the gun "*knowing* that any reasonable person would know that assaulting people with a loaded gun is dangerous to human life" (italics added) and appellant "*knew*

---

[8]  We asked for, and received, supplemental briefing on these and other issues.

17

Jesse Silva would assault with that gun." (Italics added.) The prosecutor did not argue appellant was liable for murder as an aider and abettor on the theory he aided and abetted the intended crime of assault with a firearm, a natural and probable consequence of which was murder. The jury convicted appellant as previously indicated but did not find true the special circumstance allegation.

The probation report, prepared for a June 2009 hearing, reflects as follows. Appellant was born on March 24, 1991. He was placed on juvenile probation in July 2007 for grand theft and had a pending probation violation. Appellant was a PCP abuser. He lived with his family of eight and attended school until April 2008. Appellant was a 16-year-old gang member when he committed the present offenses and he was involved with the "Primera Flats E/S; Pacoima 13" (some capitalization omitted) gang. He told police he punched Molina, fired shots in the air, and handed the gun to Silva, and Silva shot Molina. The probation officer stated, "the defendant and co-defendants discharged a firearm towards the air and the victim, murdering him; while shouting their gang names. The crimes were merciless and the victim's life [cannot] be recovered."

The report listed as aggravating factors that the crime involved great violence, great bodily harm, a threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness, and appellant had engaged in a pattern of violent conduct which indicated a serious danger to society. The report indicated there were no mitigating factors and, if special allegations were found true, consecutive sentences were required.

During the August 4, 2010 sentencing hearing, Molina's sister addressed the court. Later, the court, which had presided at appellant's jury trial, stated, ". . . Mr. Molina's sister was exactly correct. . . . [E]ven though you may not have pulled the trigger on the final shot, you're a cold-blooded murderer. You took an active role in this whole situation, which resulted in the death of somebody who had absolutely, positively no reason whatsoever to be in the line of fire. So you will almost certainly die in prison, which is appropriate because you stole Mr. Molina's life for no reason whatsoever." The

18

court, without objection, sentenced appellant to prison for 40 years to life, consisting of 15 years to life for second degree murder, plus 25 years to life pursuant to section 12022.53, subdivisions (d) and (e).  The court found section 654 applied to count 2.  The trial court awarded appellant 787 days of custody credit.

   b.  *Analysis*.

      (1)  *No Eighth Amendment Violation Occurred.*

         (a)  *Applicable Law*.

In *Graham v. Florida* (2010) 560 U.S. ___ [176 L.Ed.2d 825] (*Graham*), our Supreme Court observed the Eighth Amendment prohibits not only barbaric punishments but disproportionate ones.  (*Graham*, at p. ___ [176 L.Ed.2d at p. 835].)  Prior to *Graham*, cases addressing sentence proportionality fell into two general categories, i.e., challenges to the length of "term-of-years sentences given all the circumstances in a particular case" (*id.* at p. ___ [176 L.Ed.2d at p. 836]) and cases involving categorical restrictions on the death penalty (*ibid.*).

As to the first category, *Graham* observed, "The controlling opinion [in *Harmelin v. Michigan* (1991) 501 U.S. 957 [115 L.Ed.2d 836] (*Harmelin*)] concluded that the Eighth Amendment contains a 'narrow proportionality principle,' that . . . 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' "  (*Graham*, at p. ___ [176 L.Ed.2d at p. 836.])  Analysis of this category of cases involves a determination of whether a penalty is so disproportionate to the crime that the penalty shocks the conscience and offends fundamental notions of human dignity.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042.)  We refer to this as the "traditional" (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64 (*Mendez*)) approach.

We consider the second category of cases, not in the order in which they were decided, but generally in the order of their decreasingly severe sentences and offenses.  As discussed below, those sentences range from death, to LWOP, to a "de facto" LWOP.

*Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1] (*Roper*) exemplifies the second category of cases. In *Roper*, the high court held the Eighth Amendment categorically bars imposition of the death penalty on a juvenile offender. (*Roper*, at p. 578 [161 L.Ed.2d at p. 28].) In *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407] (*Miller*), a case involving homicides (*id*. at p. ___ [183 L.Ed.2d at p. 414]), the high court expressly left open the question of whether the Eighth Amendment *categorically* bars an LWOP sentence for juvenile offenders, or at least for those 14 years old and younger. (*Miller,* at p. ___ [183 L.Ed.2d at p. 424].) This suggests it is also an open question whether the Eighth Amendment categorically bars imposition of a "de facto" LWOP sentence for such offenders, i.e., a life sentence with a minimum term that exceeds the juvenile's life expectancy (see discussion *post*).

However, *Miller*, analogizing mandatory adult death sentences to *mandatory* LWOP sentences for juvenile offenders, and noting the former violated the Eighth Amendment, concluded the latter violated the Eighth Amendment as well. (*Miller*, *supra*, 567 U.S. at pp. ___ [183 L.Ed.2d at pp. 414-415, 417-418, 421-424.]) This suggests the Eighth Amendment also bars *mandatory* de facto LWOP sentences for such offenders.

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held the Eighth Amendment categorically bars a prison sentence of 110 years to life for nonhomicide offenses (attempted murders) committed by a juvenile.[9] (*Caballero,* at p. 265.) *Caballero* concluded the minimum term of 110 years, a term beyond the juvenile's life expectancy, was a "de facto" (*id.* at p. 269) LWOP.

*Graham* applied a categorical approach to nonhomicide offenses, holding the Eighth Amendment categorically bars a sentence of life without the possibility of parole

---

[9] In *Caballero*, a jury convicted the defendant of three attempted murders (hereafter, counts 1-3) and the term of 110 years to life consisted of 15 years to life for each attempted murder, plus 25 years to life for a firearm enhancement pertaining to count 1, plus a 20-year firearm enhancement as to each of counts 2 and 3. (*Caballero, supra*, 55 Cal.4th at p. 265.)

(LWOP) for nonhomicide offenses (armed burglary and attempted armed robbery) committed by a juvenile. (*Graham*, *supra*, 560 U.S. at pp. __ [176 L.Ed.2d at pp. 832, 834, 845].)

(b) *Application of the Law to This Case*.

(i) *Appellant's Sentence Is Not Categorically Barred.*

Appellant, relying on *Graham*, claims as to count 1 the Eighth Amendment categorically bars a sentence of 40 years to life for a homicide committed by a juvenile who did not kill or intend to kill.[10] We note at the outset the court did not sentence appellant to prison for 40 years to life merely for a homicide but, more accurately, to 15 years to life for homicide (second degree murder), plus 25 years to life for the gang-related enhancement applicable because a principal personally and intentionally discharged a firearm, proximately causing death. We assume the jury could have concluded appellant did not directly kill and did not intend to kill.[11]

---

[10]     Appellant expressly denies he has contended the Eighth Amendment categorically bars a sentence of 40 years to life for any homicide committed by a juvenile.

[11]     Appellant argues his "murder conviction was based on the natural and probable consequences doctrine, a doctrine that allows for a murder conviction where the defendant personally does not harbor malice or intent to kill, but aids and abets a crime, the natural and probable consequences of which are murder." In support of this argument, appellant relies on various citations to the prosecutor's arguments to the jury. However, as those citations and the record reveal, the prosecutor argued to the jury that appellant aided and abetted *intended crimes of murder*, i.e., (1) the intended crime of express malice murder based in part on appellant's knowledge that Silva intended to kill and (2) the intended crime of implied malice murder based in part on appellant's *knowledge* that Silva intended to do an act (the act of committing assault with a firearm) the "natural and probable consequences" of which would endanger life. That is, the prosecutor's references to "natural and probable consequence[s]" were *solely in the context of that phrase as a component of implied malice.* Although the prosecutor's argument on the above issues was not a model of clarity, the prosecutor never argued that appellant aided and abetted *the intended crime of assault with a firearm* and that murder was a "natural and probable consequence" of that assault, or that appellant aided and abetted the intended crime of assault with a firearm and murder was simply a reasonably foreseeable consequence of that assault.

21

Appellant was born in March 1991. His life expectancy[12] is therefore 72 years.[13] In August 2010, when appellant was 19 years old, the court sentenced him to prison for 40 years to life and awarded him 787 days of custody credit. Even if one ignores the award of over two years of custody credit, the 40 years will expire when appellant is 59 years old, an age substantially less than his life expectancy of 72 years. In other words, the court sentenced appellant to prison for life with a minimum term that did not exceed his life expectancy. Moreover, that sentence included the possibility of parole, and included a substantial period of years after the expiration of his minimum term but before his life expectancy.

---

Moreover, the fact the jury found not true the special circumstance allegation did not demonstrate the jury concluded appellant lacked intent to kill. There was ample evidence appellant committed second degree murder based on express malice. The jury reasonably could have found not true the special circumstance allegation simply because they did not believe appellant committed first degree willful, deliberate, and premeditated murder, even though they believed he committed second degree murder based on express malice.

[12]    *Caballero* stated, ". . . the term 'life expectancy' means the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*Caballero*, *supra*, 55 Cal.4th at p. 267, fn. 3.)

[13]    Center for Disease Control and Prevention, *Death: Final Data for 2010*, table 8 [Life expectancy at birth by race, Hispanic origin, race for non-Hispanic population, and sex: United States, 1940, 1950, 1960, 1970 and 1975-2010] <http://www.cdc.gov/nchs/data/dvs/deaths_2010_release.pdf> (as of March 4, 2013). (See *Mendez, supra*, 188 Cal.App.4th at pp. 62-63; *People v. Romero* (2002) 99 Cal.App.4th 1418, 1427, fn. 12.) Table 8 lists the life expectancy of a United States male born in 1991 as 72.0 years. This would add 53 years to appellant's age of 19 at time of sentencing. Respondent calculates appellant's life expectancy as 77 years (adding 58 years to appellant's age of 19 at time of sentencing). However, the period of 58 years is based on a 2006 table and refers to an age group for United States males between 18 and 19 years old, instead of appellant's age group which, at time of sentencing, was between 19 and 20 years old. Appellant's calculation of his life expectancy as 71.8 years is based on a table referring to persons born in 1990. Appellant was born in 1991.

A death sentence, an LWOP sentence, and a de facto LWOP sentence each exceed the defendant's life expectancy, obviously so for a death sentence. As to each such sentence, there is no possibility of parole. However, appellant invites us to apply an Eighth Amendment categorical bar to *his* sentence which includes a possibility of parole. For the reasons discussed below, we decline to do so.

Central to *Graham's* extension of the categorical approach to hold the Eighth Amendment categorically barred an LWOP sentence for nonhomicide offenses committed by a juvenile was the fact the juvenile's sentence *was in fact an LWOP sentence*. In its categorical analysis, *Graham* relied on several facts. First, LWOP sentences imposed upon juveniles for nonhomicide offenses were "exceedingly rare" (*Graham*, *supra*, 560 U.S. at p. ___ [176 L.Ed.2d at p. 841]) and " 'a national consensus ha[d] developed against [them]' " (*ibid.*). *Graham* reached the latter conclusion only after a statistical analysis of the infrequent imposition, nationwide, of LWOP sentences for juveniles who committed nonhomicide offenses. (*Id.* at pp. __ [176 L.Ed.2d at pp. 837-839.)

Second, an LWOP sentence was " 'the second most severe penalty permitted by law' " (*Graham, supra,* 560 U.S. at p. __ [176 L.Ed.2d at p. 842]) and shared "characteristics with death sentences that are shared by no other sentences" (*ibid.*), such as an irrevocable forfeiture and a deprivation of liberty without hope of restoration. Third, an LWOP sentence for a juvenile was especially harsh because the juvenile "will on average serve more years and a greater percentage of his life in prison than an adult offender" (*id.* at p. __[176 L.Ed.2d at p. 843]). Appellant has failed to demonstrate that the above analysis applies with equal force to a life sentence the minimum term of which does not exceed the juvenile's life expectancy, a sentence which therefore includes the possibility of parole.

*Graham* also concluded penological justifications—retribution, deterrence, incapacitation, and rehabilitation—could not support an *LWOP* sentence for a juvenile for a nonhomicide offense. (*Graham*, *supra*, 560 U.S. at pp. ___ [176 L.Ed.2d at pp. 843-

23

845].) *Graham* noted incapacitation could not justify an *LWOP* sentence because such a sentence presumed the juvenile was incorrigible, and " 'incorrigibility is inconsistent with youth.' " (*Id.* at p. ___ [176 L.Ed.2d at p. 844].) According to *Graham*, rehabilitation could not justify an *LWOP* sentence because "the penalty forswears *altogether* the rehabilitative ideal." (*Id.* at p. ___ [176 L.Ed.2d at p. 845], italics added.) *Graham* found support for its conclusion that LWOP sentences for juveniles for nonhomicide offenses violated the Eighth Amendment in the fact " 'the United States now stands alone in a world that has turned its face against' *life without parole* for juvenile nonhomicide offenders. [Citation.]" (*Graham*, at p. ___ [176 L.Ed.2d at p. 850], italics added.) Appellant has not demonstrated the above analysis applies with equal force to his sentence.

It is true that *Graham*, focusing on the offender and the offense, also considered the facts juveniles have less culpability than adults, and a juvenile who does not kill or intend to kill has a twice diminished moral culpability than an adult murderer. (*Graham*, *supra*, 560 U.S. at p. ___ [176 L.Ed.2d at p. 842].) However, as indicated, these facts were only part of the high court's categorical analysis that heavily relied on the fact the sentence in that case was an LWOP sentence. In light of the above, we conclude juveniles with (1) LWOP sentences or de facto LWOP sentences and (2) juveniles with life sentences with a minimum term that not only *does not* exceed life expectancy but is *more than a decade* short of life expectancy, are too dissimilar to justify an Eighth Amendment categorical bar to a sentence of 40 years to life for a homicide committed by a juvenile in a gang-related case in which a principal shot and killed the decedent.

Beyond that, we believe those dissimilarities preclude a categorical bar to a sentence of 40 years to life even if said juvenile did not directly kill and did not intend to kill.

The high court has employed a categorical approach to remedy mismatches between a penalty and a *class of offenders*, as when the court concluded in *Roper* that the Eighth Amendment categorically bars death sentences on *juvenile* offenders. The high

24

court has employed a categorical approach to remedy mismatches between a penalty and a *class of offenses*, as when the court concluded in *Kennedy v. Louisiana* (2008) 554 U.S. 407 [171 L.Ed.2d 525] that the Eighth Amendment categorically bars death sentences for *nonhomicide* crimes. (*Graham*, *supra*, 560 U.S. at pp. ___ [176 L.Ed. at pp. 836-837].) In *Graham*, the high court employed a categorical approach to remedy the mismatch between a penalty (an LWOP sentence), a class of offenders (juveniles), and a class of offenses (nonhomicide crimes).

However, appellant cites no authority employing a categorical approach to remedy a perceived mismatch between a penalty, a class of offenders (juveniles), and a— potentially endless—class of *facts* about an offense. Yet appellant invites us to employ just such an approach when he claims the Eighth Amendment categorically bars a sentence of 40 years to life for an offense committed by a juvenile who *did not kill or intend to kill.*

The high court in *Miller* was aware defendants who do not kill or intend to kill are categorically less deserving of the most serious forms of punishment than murderers, and was aware juvenile offenders in such circumstances have twice diminished moral culpability. (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 423].) Notwithstanding that knowledge, *Miller* expressly refrained from considering whether the Eighth Amendment categorically bars LWOP sentences for juvenile offenders (*Miller*, at p. ___ [183 L.Ed.2d at p. 424]) and did *not* conclude the Eighth Amendment categorically barred LWOP sentences for juvenile offenders *who did not kill or intend to kill*.

A conclusion the Eighth Amendment categorically bars a sentence of 40 years to life for a homicide committed by a juvenile who did not directly kill or intend to kill presents additional problems. First, as mentioned, the high court left open the question of whether the Eighth Amendment categorically bars LWOP sentences for juvenile offenders, and this suggests it is also an open question whether the Eighth Amendment categorically bars de facto LWOP sentences for juvenile offenders. If we concluded the Eighth Amendment categorically bars a sentence of 40 years to life for a homicide

25

committed by a juvenile who did not kill or intend to kill, we see no principled basis on which we could avoid concluding, a fortiori, the Eighth Amendment categorically bars more severe LWOP and de facto LWOP sentences for juvenile offenders who did not kill or intend to kill. We would thereby resolve these issues absent any information as to whether, e.g., a national consensus exists against such sentences, and despite the fact it appears the high court carefully has left undecided these issues.

Second, there appears to be no principled basis on which we could conclude the Eighth Amendment categorically bars a sentence of 40 years to life for a homicide committed by a juvenile who did not directly kill or intend to kill, without also having to conclude lesser sentences for homicides committed by juveniles who did not directly kill or intend to kill are categorically barred. This would include a sentence of 25 years to life, by itself, for a juvenile accomplice to first degree felony murder (§§ 189, 190, subd. (a)). It would include a sentence of 35 years to life, i.e., 15 years to life for a juvenile accomplice to second degree murder based on implied malice (§ 190, subd. (a)) plus 20 years for personal and intentional discharge of a firearm (§ 12022.53, subd. (c)). It would include a sentence of 15 years to life, by itself, for a juvenile accomplice to second degree murder based on implied malice.

Indeed, once one applies an Eighth Amendment categorical approach to bar a sentence of 40 years to life for a homicide committed by a juvenile who did not directly kill or intend to kill, it is not clear why the Eighth Amendment would not categorically bar lengthy *determinate* terms for homicides committed by juveniles who do not directly kill or intend to kill. This would include a sentence of 11 years in prison for voluntary manslaughter (§ 193, subd. (a)), even though that sentence includes the possibility of parole (§ 3000, subd. (b)(1)). The next logical step would be to challenge a four-year sentence for involuntary manslaughter, even though that sentence too includes the possibility of parole (§ 193, subd. (b); 3000, subd. (b)(1)).

Third, a conclusion the Eighth Amendment *categorically* bars a sentence of 40 years to life for a homicide committed by a juvenile who did not kill or intend to kill would be largely inconsistent with pre-*Miller* cases employing a *traditional* Eighth Amendment approach to conclude the Eighth Amendment did not bar imposition of even lengthier sentences in cases similar to this one involving juvenile offenders. (*People v. Em* (2009) 171 Cal.App.4th 964, 966-967, 969 (*Em*) [25 years to life for *first degree* murder, plus 25 years to life for the gang-related firearm enhancement]; *People v. Gonzalez* (2001) 87 Cal.App.4th 1, 5, 7, 11-12, 16-19 [same]; see *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 12 [consecutive term of 25 years to life for each of two murders; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1228-1230 [40 years to life consisting of life with the possibility of parole for attempted premeditated murder, 15 years to life for a gang enhancement, and 25 years to life for a firearm enhancement].)

In *People v. Argeta* (2012) 210 Cal.App.4th 1478 (*Argeta*), a defendant who was five months past his 18th birthday when he committed murder and attempted murders relied on *Graham*, *Mendez*, *Miller*, and *Caballero* to claim the Eighth Amendment categorically barred his sentence, which apparently was a de facto LWOP sentence. (*Argeta*, *supra*, 210 Cal.App.4th at pp. 1480-1482.) *Argeta* stated, "while '[d]rawing the line at 18 . . . is subject . . . to the objections always raised against categorical rules . . . [, that] is the point where society draws the line for many purposes between childhood and adulthood. . . .' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude Argeta's sentence is not cruel and/or unusual under *Graham*, *Miller*, or *Caballero*." (*Argeta*, *supra*, 210 Cal.App.4th at p. 1482.)

27

Current Eighth Amendment jurisprudence suggests that in the constitutional calibration of offenses and penalties, the protections of categorical bars to sentences diminish not only as one advances from minority to adulthood, but as sentences lessen in severity. Sentences for criminal homicides generally diminish in severity as the gravity of the offenses lessen. Accordingly, there are sentences of death, LWOP sentences, de facto LWOP sentences, sentences of life with a minimum term that does not exceed life expectancy (the sentence at issue in this case), and determinate terms. The first three sentences lack the possibility of parole; the last two do not.

Just as a line may be drawn at *minority*, preventing application of an Eighth Amendment categorical bar to de facto LWOP sentences for *adults*, a line may be drawn at a *de facto LWOP sentence*, preventing application of a categorical bar to *less severe sentences* for a juvenile, such as the sentence in this case. If the line is not drawn here, categorical bars to lesser sentences such as appellant's could effectively eviscerate traditional analysis.

We hold the Eighth Amendment does not categorically bar imposition of a sentence of 40 years to life for a homicide committed by a juvenile who did not kill or intend to kill. Our employment of a bright-line rule rejecting an Eighth Amendment categorical bar to such a sentence is consistent with the current state of Eighth Amendment jurisprudence, the unique severity of an LWOP or de facto LWOP sentence, and the importance of the fact the defendant in *Graham* received an LWOP sentence to the high court's application of a categorical approach in that case. Our holding does not leave appellant without Eighth Amendment review of his sentence, since we will later consider his sentence under the traditional approach.

(ii) *Appellant's Mandatory Sentence Is Not Barred.*

We similarly reject appellant's claim the Eighth Amendment bars a mandatory sentence of 40 years to life for a homicide committed by a juvenile. As mentioned, the court sentenced appellant, more accurately, to 15 years to life for homicide (murder), plus 25 years to life for the gang-related firearm enhancement. *Miller* held the Eighth

28

Amendment bars a mandatory *LWOP* sentence for a juvenile, but *Miller* reached that conclusion by analogizing to case law holding mandatory *death* sentences for adults violated the Eighth Amendment, and *Miller* heavily relied on the fact the sentence at issue in that case was an *LWOP* sentence.  (*Miller*, *supra*, 567 U.S. at pp. ___ [183 L.Ed.2d at pp. 414-415, 417-418, 421-424].)  For reasons previously discussed, a sentence of 40 years to life significantly differs from a death sentence, an LWOP sentence, and a de facto LWOP sentence.  Moreover, appellant's sentence not only includes a possibility of parole but a substantial period of years after the expiration of his minimum term but before his life expectancy.  Appellant cites no case holding his mandatory sentence is cruel and unusual.

Further, there appears to be no principled basis on which we could conclude the Eighth Amendment bars a mandatory sentence of 40 years to life for a homicide committed by a juvenile under the circumstances presented in this case, without also having to conclude the Eighth Amendment bars lesser mandatory sentences previously discussed.  Those would include 25 years to life for first degree felony murder and 15 years to life for second degree murder.  A "sentence which is not otherwise cruel and unusual [does not] become[] so simply because it is 'mandatory.' "  (*Harmelin*, *supra*, 501 U.S. at p. 995 [115 L.Ed.2d at p. 865].)  Having concluded the Eighth Amendment does not categorically bar appellant's sentence, the remaining issue is whether the Eighth Amendment bars his sentence under the traditional approach (and we conclude below it does not); therefore, appellant's sentence which is not otherwise cruel and unusual does not become so simply because it is mandatory.

(iii)  *Appellant's Sentence Is Not Disproportionate.*

Finally, appellant claims his sentence on count 1 violates the Eighth Amendment under a traditional analysis.  We conclude otherwise.  First, he waived the issue by failing to raise it below.  (*People v. Norman* (2003) 109 Cal.App.4th 221, 229.)

Even if the issue were not waived, appellant's claim is without merit.  We presume the trial court read and considered the probation report (*People v. Black* (2007) 41 Cal.4th

799, 818, fn. 7) and was therefore aware of appellant's age at the time he murdered Molina. We have set forth pertinent facts concerning appellant, his background, and the murder of Molina.

Appellant aided and abetted a gang-related intentional shooting and murder of an unarmed victim, and there was substantial evidence appellant provided the gun to Silva with intent to kill. Even taking into consideration appellant's age and factors discussed in *Miller*, *supra*, 567 U.S. at pp. ___ [183 L.Ed.2d at pp. 422-423] and *Caballero*, *supra*, 55 Cal.4th at pp. 268-269, relating to his youth and background at the time of the offenses, we conclude appellant has failed to raise an inference of gross disproportionality for purposes of Eighth Amendment traditional analysis, and has failed to demonstrate his sentence was that "exquisite rarity" (*Em, supra,* 171 Cal.App.4th at p. 972) that violated federal and/or state constitutional prohibitions against cruel and/or unusual punishment. As mentioned, case law upholds, as against Eighth Amendment challenges, the imposition on juvenile murderers of a life sentence with a minimum term not exceeding the life expectancy of the juvenile. (See *Em,* at pp. 971-977; *Demirdjian, supra,* 144 Cal.App.4th at pp. 12-16; *Gonzales, supra,* 87 Cal.App.4th at pp. 16-19.) Appellant's constitutional challenges fail.[14]

(2) *Senate Bill No. 9 Is Inapplicable.*

Appellant argues we must construe recent Senate Bill No. 9 to permit resentencing of appellant, otherwise his sentence violates his equal protection rights and constitutes cruel and unusual punishment. We disagree.

In 2012, the Legislature enacted Senate Bill No. 9, which, inter alia, amended section 1170 by adding section 1170, subdivision (d)(2). The legislation was enacted on September 30, 2012, during the 2011-2012 regular session (Stats. 2012, ch. 828, § 1) and not as urgency legislation; therefore, the legislation became effective on January 1, 2013.

---

[14]     The trial court's comment, not factually substantiated at the hearing, that appellant would almost certainly die in prison (a comment obviously impacted by previous comments from Molina's sister) does not compel a contrary conclusion.

30

(Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).) The legislation is retroactive. (§ 1170, subd. (d)(2)(J).)

To summarize, section 1170, subdivision (d)(2) generally provides "a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole" (§ 1170, subd. (d)(2)(A)(i)) and who has served at least 15 years of that sentence may file with the sentencing court a petition for resentencing that states statutorily-required mitigating information, including one of four mitigating factors (§ 1170, subd. (d)(2)(B)(i-iv)).

If the court finds the statements are true, the court must hold a hearing to consider whether to resentence de novo the juvenile (§ 1170, subd. (d)(2)(E)), and that resentencing determination is based on, inter alia, additional statutorily-specified criteria (§ 1170, subd. (d)(2)(F)(i-viii)). The court has the discretion to resentence de novo the juvenile. (§ 1170, subd. (d)(2)(G).) If the court denies the petition, the juvenile can submit successive petitions after serving 20 years, then 24 years, and finally during the 25th year of the sentence. (§ 1170, subd. (d)(2)(H).)

" ' "To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent." [Citation.] If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. [Citation.] "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citation.]' [Citation.]" (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 905.)

Section 1170, subdivision (d)(2) clearly and unambiguously applies to juveniles "sentenced to imprisonment for life without the possibility of parole." (§ 1170, subd. (d)(2)(A)(i).) According to the plain meaning of its terms, the section does not apply to juveniles, like appellant, who were sentenced to prison for 40 years to life, i.e., a sentence

31

including the possibility of parole.  Appellant is effectively inviting us to rewrite the statute.  We decline to do so.

Appellant's equal protection argument is without merit simply because appellant has failed to demonstrate a juvenile who received an LWOP sentence, the harshest sentence a juvenile can receive, and a juvenile such as appellant who received a less harsh sentence of 40 years to life, a sentence including the possibility of parole, are similarly situated with respect to the legislative objective of permitting resentencing. State legislation need not be comprehensive and can address a problem piecemeal or only in those aspects where the need for regulation appears to the legislature to be greatest. (Cf. *Warden v. State Bar* (1999) 21 Cal.4th 628, 644-645.)  Since the persons at issue are not similarly situated, appellant's equal protection claim fails.  (See *Gonzales*, *supra,* 87 Cal.App.4th at pp. 12-13.)  The fact section 1170, subdivision (d)(2) provides for a resentencing procedure for juveniles with LWOP sentences does not affect our previous Eighth Amendment analysis and his instant claim does not demonstrate any other Eighth Amendment violation.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

CROSKEY, Acting P. J.

ALDRICH, J.

33